1  **HOWARD LAW, PC**
   VINCENT D. HOWARD (SBN 232478)
2  vhoward@howardlawpc.com
   GREGORY H. D. ALUMIT (SBN 257124)
3  galumit@howardlawpc.com
   675 Anton Boulevard, First Floor
4  Costa Mesa, CA 92626
   Tel.: (800) 872-5925
5  Fax: (888) 533-7310

6  **ARBOGAST LAW**                        **BERNS WEISS LLP**
   A Professional Corporation               JEFFREY K. BERNS (SBN 131351)
7  DAVID M. ARBOGAST (SBN 167571)          jberns@bernsweiss.com
   david@arbogastlawpc.com                  20700 Ventura Blvd., Suite 140
8  11400 W. Olympic Blvd., 2nd Floor        Woodland Hills, CA, 91364
   Los Angeles, CA 90064                    Tel.: (818) 961-2000
9  Tel.: (310) 477-7200                     Fax: (818) 999-1500
   Fax: (310) 943-0416

10

11 Attorneys for Plaintiffs and the putative Class.

12                   **UNITED STATES DISTRICT COURT**

13                   **CENTRAL DISTRICT OF CALIFORNIA**

14

15 JAYSON BECK, NANCY BECK,              **CASE NO.** 2:13-cv-06853-DDP-PJW
   REYNALDO ALCALDE and
16 NERISSA ALCALDE, on behalf of         *[Assigned to the Hon. Dean D.*
   themselves and all others similarly   *Pregerson]*
17 situated,

18          Plaintiffs,                    <u>CLASS ACTION</u>
                                           **FIRST AMENDED CLASS ACTION**
19                                         **COMPLAINT FOR:**

20   v.                                    1) **VIOLATION OF CALIFORNIA'S**
                                              **HBOR – BAN ON DUAL**
21 OCWEN LOAN SERVICING, LLC;                **TRACKING;**
   and DOES 1-10, inclusive,             2) **VIOLATION OF CALIFORNIA'S**
22                                           **HBOR – ILLEGAL COLLECTION**
                                             **OF LATE FEES;**
23          Defendants.                   3) **BREACH OF CONTRACT; and**
                                          4) **VIOLATIONS OF THE**
24                                           **CALIFORNIA UNFAIR**
                                             **COMPETITION LAW ACT**
25

26

27                                        **JURY TRIAL DEMANDED**

28

Plaintiffs JAYSON BECK and NANCY BECK (the "Becks") and REYNALDO ALCALDE and NERISSA ALCALDE (the "Alcaldes") (collectively the "Plaintiffs"), individually, and on behalf of all others similarly situated, allege as follows:

## I.   INTRODUCTION

1.      This is an action for violations of California's Homeowner Bill of Rights (the "HBOR") and Unfair Competition Law, Business & Professions Code §§ 17200, et seq. (the "UCL"), and breach of contract.  Plaintiffs, individually, and on behalf of all others similarly situated, bring this action against OCWEN LOAN SERVICING, LLC ("Ocwen") and DOES 1-10 based upon Ocwen's routine business practices of 1) illegally pursuing foreclosures while homeowners' loan modification applications are pending and also after homeowners are approved in writing for loan modifications and complying with the terms of their loan modifications (also known as "dual-tracking"), 2) illegally collecting late fees both when a homeowner's loan modification application is pending and when a homeowner is making trial loan modification payments, and 4) knowingly breaching trial plan loan modification contracts.

2.      By engaging in the above-described business practices, Ocwen has uniformly violated the HBOR, breached contracts, and has committed one or more acts of unfair competition under the UCL.

## II.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a state different from Ocwen.

4.      This Court has personal jurisdiction over the parties in this action because Ocwen is licensed to do business in the State of California or otherwise conducts business in the State of California.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in as much as the unlawful practices discussed herein are alleged to have been committed in this District, Ocwen regularly conducts business in this District, and the Plaintiffs reside in this District.

**III.   PARTIES**

**A.    The Plaintiffs**

6.    Plaintiffs JAYSON BECK and NANCY BECK (the "Becks") are California citizens who reside, and at all times relevant have resided, at 3713 Aspen Lane, Chino Hills, CA 91709, which is their principal residence.  On or about November 11, 2004, the Becks obtained a mortgage on their home, which was, at all times relevant, serviced by Ocwen.

7.    Plaintiffs REYNALDO ALCALDE and NERISSA ALCALDE (the "Alcaldes") are California citizens and reside, and at all times relevant have resided, at 1155 Eagle Vista Drive, Los Angeles, CA 90041, which is their principal residence.  On or about October 17, 2006, the Alcaldes obtained a mortgage on their home, which was, at all times relevant, serviced by Ocwen.

8.    The Becks and the Alcaldes are sometimes collectively referred to herein as "Plaintiffs."

**B.    The Defendants**

9.    Defendant OCWEN LOAN SERVICING, LLC is, and at all times mentioned in this Class Action Complaint was, a limited liability corporation, registered in St. Croix, U.S. Virgin Islands and headquartered in Atlanta, Georgia. Ocwen acquires and services subprime and nonperforming residential mortgage loans.  Ocwen is licensed to do business in California and transacts business throughout California.

10.    The true names and capacities, whether individual, corporate, associate or otherwise, of Doe Defendants 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Doe Defendants by

2

such fictitious names.  On information and belief, each Doe Defendant is responsible for the actions herein alleged.  Plaintiffs will amend this Class Action Complaint when the names of said Doe Defendants have been ascertained (hereinafter "Defendants" refers to both named and Doe Defendants unless otherwise specified by name).

11.    Plaintiffs are informed, believe, and thereon allege that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

12.    Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

13.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

14.    Plaintiffs are informed, believe, and thereon allege, that Defendants, and each of them, at all material times relevant to this Complaint, performed the acts alleged herein and/or otherwise conducted business in California.  Defendants, and each of them, are corporations or other business entities, form unknown, have and are doing business in this judicial district.

3

15.     Plaintiffs are informed, believe, and thereon allege, that at all times relevant during the liability period, that Defendants, and each of them, including without limitation those Defendants herein sued as Does, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.     Mortgage Servicing

16.     A mortgage servicer stands in for the beneficial owner of a mortgage loan in virtually all dealings with homeowners.  It is the servicer to whom the homeowners mail their monthly payments, the servicer who provides billing and tax statements for homeowners, and the servicer to whom a homeowner in distress must address a request for a loan modification and/or postponement of a foreclosure sale.

#### 1.     Servicers Have Strong Incentives to Pursue Foreclosures

17.     Servicers' main source of income is a monthly servicing fee based on a percentage of the outstanding principal balance of a loan.  However, servicers have a strong incentive to foreclose on delinquent loans, as they can often make more money by foreclosing on a home than by modifying a loan on that home.  The potential losses of income from the monthly servicing fee are often dwarfed by the fees generated for the servicer by the foreclosure process.

18.     Late fees and other "default management" fees, such as property inspections, are a large source of income for servicers, as they retain these fees when they are paid by delinquent homeowners.  The profitability of these fees can be significant, and late fees alone constitute a significant portion of many servicers' total income and profit.  Moreover, even if homeowners do not pay these fees, servicers are able to collect them from the proceeds of foreclosure sales before the owners of

4

the mortgage loan receive any recovery.  This guaranteed recovery of fees provides a strong incentive for servicers to foreclose on properties.

19.    Because fees for other activities like force-placed insurance, property inspections, appraisals, title searches, and legal services to affiliated entities are also recovered out of foreclosure proceeds, many servicers also in-source these activities, which is yet another reason for servicers to push foreclosures as opposed to modifications.

20.    Servicers incur significant expenses when a loan is in default:  advances of principal and interest to the owners of the loans, advances of property taxes and home insurance, and advance payments to third parties for default services such as property inspections, title searches, attorney fees, property maintenance fees, and foreclosure fees.  The financing cost of advances on delinquent loans is the largest expense of many servicers.  Reducing the cost of this expense is a key component of making servicing profitable.  Once a foreclosure is complete, the requirement to continue making advances stops and servicers are entitled to receive their advances back.

**2.    The Financial Benefits of Foreclosures Causes Servicers to Engage in Illegal Dual Tracking**

21.    Dual tracking occurs when servicers process both a foreclosure and a loan modification application for the same borrower at the same time.  Short-term repayment plans, such as trial modifications, are very attractive to servicers, as they require little to no underwriting, they do not require the servicer to recognize any long-term loss and, because they can be processed quickly, they address the servicers' largest expense: financing principal and interest advances to the owners of defaulted loans and the advance payments for default services. However, the foreclosure incentives discussed above encourage servicers to proceed along a dual track, as their primary goal is foreclosure, not permanent modification.

///

5

22.    The owners of the loans expect subprime servicers, such as Ocwen, to strictly adhere to explicit timelines, offer and accept workouts from only a predefined and standardized set of options, and not delay foreclosure while loss mitigation is underway.  The speed at which loans are moved from default through foreclosure is a key driver in the servicer rating process, encouraging servicers to compete for the fastest time to foreclosure.

23.    Servicers process foreclosures and loan modifications through different departments.  Communication between the two departments is imperfect. Homeowners who are assured that they will be receiving a loan modification by one department may nonetheless find themselves facing a foreclosure.  This occurs, in part, because loan modifications often require more deviations from the norm, such that they often take more time to work out than foreclosures do.  Servicers rely heavily on the mechanized production of form documents in processing both foreclosures and loan modifications.  Any variation from the cookie-cutter norm imposed by the form documents causes delay.  But the dual-track system pushes the foreclosure forward regardless of any delay in the modification process, with the result that foreclosures frequently occur while homeowners are negotiating a loan modification, and sometimes even after they have been approved for a loan modification.

24.    Servicers generally do not have any ownership interest in the loans they service and the financial incentives described above for servicing loans are reasons why servicers favor foreclosures over permanent modifications and why servicers engage in illegal dual tracking.

25.    Because the dual-tracking system prevents homeowners from being evaluated for appropriate loan modifications before foreclosure, it has resulted in many unnecessary foreclosures.

///

///

6

### 3.   Servicers Often Illegally Charge Late Fees to Struggling Homeowners Who Are Trying to Modify Their Loans

26.    Although not permitted under the HBOR, there is little downside for servicers to improperly charge late fees to financially distressed homeowners who are trying to have their loans modified, as successfully challenging an illegally imposed late fee will not cure a mortgage default, much less make the mortgage affordable going forward.  Unless the homeowner has equity in the property, once that homeowner is losing the property, there is little point in haggling over the amount owed to the lender, especially in states like California, where deficiency judgments are not permitted.  Even small illegal late charges, which are not likely to draw much attention, can be quite profitable for servicers if they are imposed in substantial volume.

27.    In a self-perpetuating cycle, the imposition of improper late fees on a struggling borrower makes a foreclosure more likely by increasing the total amount owed to the lender, and thus, increasing the monthly payment amounts in a potential modification.

### B.   The HBOR Outlaws Dual Tracking and Protects Distressed Homeowners from the Imposition of Late Fees While They Are Attempting to Have Their Mortgages Modified or Making Payments Pursuant to a Loan Modification

28.    The HBOR, which became law on January 1, 2013, marked the third step in California Attorney General Kamala Harris' response to the state's foreclosure and mortgage crisis.  The first step was to create the Mortgage Fraud Strike Force, which has been investigating and prosecuting misconduct at all stages of the mortgage process.  The second step was to extract a commitment from the nation's five largest banks of an estimated $18 billion for California borrowers under the National Mortgage Settlement.  This joint federal-state settlement contained thoughtful foreclosure and mortgage servicing reforms.  However, these reforms are only applicable for three years, and only to loans serviced by the five settling banks: Ally/GMAC, Bank of America, Citi, JPMorgan Chase and Wells Fargo.  Thus, the

7

California Legislature intended the HBOR to extend the reforms addressed in the National Mortgage Settlement to almost all mortgage lenders and servicers and to bring fairness, accountability, and transparency to the mortgage servicing and foreclosure processes in California.

29.     According to California's Department of Justice and the Office of the Attorney General, the purpose of the HBOR is to ensure that as part of California's nonjudicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through the borrowers' mortgage servicer, such as loan modifications or other alternatives to foreclosure.

30.     One of the most important aspects of the HBOR is that it outlaws dual-tracking.  Specifically, California Civil Code §§ 2923.6 and 2923.11 prohibit initiating or continuing the foreclosure process when a borrower's request for loss mitigation is under consideration, or a foreclosure prevention option has been approved in writing and the homeowner is complying with the terms of that option.

31.     Another important provision of the HBOR prohibits the collection of any late fees when a loan modification application is pending or while the borrower is making timely modification payments. California Civil Code § 2924.11(f).

## C.     Ocwen's Business Practices

32.     In 1986, Ocwen entered the residential servicing business by purchasing non-performing/underperforming loans and improving the liquidation rate of these loans.  Since then, Ocwen has specialized in the servicing of subprime and seriously delinquent loans and has developed proprietary servicing and collection practices using scientific management, psychology, and Six Sigma methodology.

33.     Ocwen automates procedures whenever possible, including using the proprietary servicing system, REALResolution, which provides Ocwen with an automated loss mitigation and foreclosure solution for Ocwen's delinquent or defaulted loans in California.  The REALResolution technology platform uses,

among other things, analytical optimization models, artificial intelligence, scientific algorithms, behavioral science-based principles, statistical/econometric models, structured decision tree frameworks, and pre-determined scripts. A recent testimonial by Ocwen's Director of Resolution Processing and Administration stated, "We were required to make unique enhancements to REALResolution as a result of a Six Sigma project and a corporate goal to automate Default Servicing processes. The enhancements are expected to reduce manual efforts while processing a loan and reduce the timeline to move the property to REO [Real Estate Owned foreclosures]."

34.     Two of the main features of Ocwen's REALResolution platform are its Loss Mitigation and Foreclosure Modules. The Loss Mitigation Module is supposed to have automated tools which may provide a loan resolution and workout strategy for non-performing loans. The Foreclosure Module is a web-based management and tracking system that is supposed to facilitate completion of the foreclosure process, ensure timeline adherence, eliminate redundancies, and minimize losses during the foreclosure process.

35.     As a consequence of Defendant's business practice to utilize automated procedures through its REALResolution platform's Loss Mitigation and Foreclosure Modules, Ocwen routinely fails to comply with the HBOR's dual-tracking ban because Ocwen continues to process loss mitigation options for homeowners and push foreclosure sales for these same homeowners at the same time.

36.     Ocwen's Loss Mitigation Department handles homeowners' requests for loan modifications. Homeowners can submit a loan modification application to Ocwen in a number of ways, including through Ocwen's website. When Ocwen receives a loan modification application, Ocwen's Loss Mitigation Department commences its REALResolution Loss Mitigation Module which is supposed to, among other things, use predictive analytical algorithms and behavioral science principles to determine resolutions for delinquent borrowers, perform both Home Affordable Modification Program ("HAMP") and non-HAMP analyses, interface

9

with other servicing platforms, telephony environments, and document management systems to automate and execute the entire modification process including distribution of the modification agreement to the borrower, and provide a loan status tracking dashboard which includes required loss mitigation timelines.

37.    Ocwen's Default Servicing Unit handles foreclosure processing.  Once a mortgage loan is in default or delinquent, Ocwen's default servicing unit commences its REALResolution Foreclosure Module which is supposed to, among other things, automate initiation of foreclosure proceedings on defaulted loans, facilitate expedited management of foreclosure loans and track legal proceedings, automate foreclosure case history tracking, interface with the servicing and order management systems, minimize loss of revenue from delinquent loans, and auto-assign foreclosure eviction attorneys and coordinators.  On information and belief, even if a defaulted or delinquent loan is being considered for a resolution by Ocwen's Loss Mitigation Module or the loan already has an active loss mitigation resolution pending in the Loss Mitigation Module, Ocwen has a policy to refer these loans to foreclosure on the 92nd day of default or delinquency.  In other words, a notice of default is routinely recorded on the 92nd day of default or delinquency on these loans to initiate the foreclosure process, even where these loans are still being considered for a loan modification or where the borrower is already making payments pursuant to a loan modification agreement.

38.    Ocwen also maintains a business practice of illegally charging late fees on delinquent loans that are being considered by the Loss Mitigation Module or where a loss mitigation resolution has been approved by the Loss Mitigation Module. Even if a defaulted or delinquent loan is being considered for a resolution by Defendants' Loss Mitigation Module or the loan already has an active loss mitigation resolution pending in the Loss Mitigation Module, Ocwen's policy is to continue charging these homeowners late fees.

///

10

39.   Ocwen also engages in a routine business practice of placing delinquent homeowners in short-term trial plan workout agreements and then putting any trial plan payments made by the homeowner into a "suspense" account rather than crediting them to the homeowner's loan.   This practice allows Ocwen's REALResolution modules to continue to treat these homeowners as failing to make their mortgage payments each month, and thus, Ocwen continues to charge them late fees.

40.   Ocwen's practices of improperly charging late fees to borrowers is a win-win proposition because these late fees are added to the borrower's unpaid principal balance, thus increasing Ocwen's monthly servicing fee, or Ocwen can recoup these late fees after a foreclosure sale.

## V.   PLAINTIFFS' EXPERIENCE WITH OCWEN

### A.   The Becks

41.   On or about August 9, 2012, the Becks submitted a loan modification application to Ocwen in connection with the first mortgage on their owner occupied property.   On or about August 10, 2012, Ocwen informed the Becks that the name of their application's underwriter was "Neal."   On or about August 14, 2012, Ocwen informed the Becks that they needed to provide Ocwen with proof of homeowners' insurance and a hardship letter, which Plaintiffs then sent to Ocwen on or about August 15, 2012.

42.   On or about November 6, 2012, Ocwen advised the Becks that their loan modification application was still pending and requested that the Becks provide pay stubs, which the Becks provided to Ocwen on or about November 8, 2012.

43.   On or about January 2, 2013, Ocwen requested that the Becks provide additional hardship documents, which the Becks provided to Ocwen on that same day.

44.   On or about January 11, 2013, the Becks received a Trial Plan Modification offer from Ocwen.   *See* Exhibit A.   The cover letter accompanying the

11

Trial Plan Modification offer stated: "In order to accept this modification on your loan, you must complete ALL of the following steps on or before 2/1/13, ("Due Date"): 1. SIGN the bottom of the Agreement . . . 2. FAX the fully executed Agreement . . . 3. PAY the full down payment in the amount of: $1,490.19 . . . 4. NEW MONTHLY PAYMENT: . . . $1,490.19 . . . 5. SEND proof of insurance . . . Failure to send proof of insurance coverage before the Due Date will constitute acceptance of a force placed policy and agreement to pay the costs of such forced placed policy, so long as all other items are complete."

45.     The Becks accepted the Trial Plan Modification agreement by signing and faxing it to Ocwen with proof of insurance coverage on January 14, 2013, and by making an electronic payment to Ocwen in the amount of $1,490.19 on February 1, 2013.

46.     On or about February 5, 2013, Ocwen accepted the Becks electronic payment of $1,490.19.

47.     On or about February 23, 2013, the Becks contacted Ocwen by phone to confirm that Ocwen had received all of the loan modification documents. Ocwen claimed it had not received the Becks' loan modification documents. Thus, on February 23, 2013, the Becks re-faxed to Ocwen the executed Trial Plan Modification agreement and proof of insurance coverage.

48.     On March 1, 2013, the Becks made a second modified monthly mortgage payment to Ocwen in the amount of $1,490.19, which Ocwen also accepted.

49.     On March 14, 2013, the Becks received a notice of change of ownership of property stating that their home had been purchased at a trustee's sale by Wedgewood Community Fund II, LLC ("Wedgewood"), a third-party buyer. *See* Exhibit B. The Becks immediately contacted the phone number listed on the notice of change of ownership of property documents, and Nathan Reeves, the property supervisor at Wedgewood, confirmed to them that their home had been sold to

Wedgewood.

50.    On March 15, 2013, the Becks contacted Ocwen regarding the trustee's sale. Ocwen confirmed to the Becks that their home was sold and that Ocwen would keep their February 1, 2013 payment in the amount of $1,490.19. Ocwen has not returned the Becks' February 1, 2013 payment in the amount of $1,490.19 or Plaintiffs' March 1, 2013 payment in the amount of $1,490.19.

51.    On March 22, 2013, the Becks sent a letter to Ocwen stating that a foreclosure should have never occurred because Ocwen was accepting payments pursuant to the Trial Plan Modification agreement. By letter dated March 26, 2013, Ocwen responded that it would research the foreclosure sale issue and provide a written response to the Becks within 20 days.

52.    On March 27, 2013, a Trustee's Deed Upon Sale for the Becks' home was recorded in favor of Wedgewood. *See* Exhibit C.

53.    On April 1, 2013, the Becks made a third modified monthly mortgage payment to Ocwen in the amount of $1,490.19. Ocwen accepted and has not returned this payment.

54.    On April 5, 2013, the Becks received a notice from the Court pursuant to California Code of Civil Procedure § 1161.2 indicating that an Unlawful Detainer action had been filed with the court naming the Becks as parties to the action. On April 11, 2013, after multiple attempts, the Becks were finally able to speak with an Ocwen representative regarding its research as to the trustee's sale. However, the Ocwen representative stated only that Ocwen's research was not yet completed. On April 15, 2013, the Becks sent an e-mail to Paul Koches, general counsel for Ocwen, requesting that Ocwen escalate the Becks' review request in order to determine how a foreclosure could have occurred after the Becks had accepted Ocwen's loan modification offer and while the Becks were making payments according to the loan modification agreement.

///

55.  On April 15, 2013, the Becks also contacted Ocwen and spoke with Ocwen representative Rakeesh Rao, who stated that Ocwen would respond to the Becks' inquiry regarding the foreclosure sale by the end of the day.

56.  On or about April 16, 2013, the Becks found an Unlawful Detainer Complaint at their front door.  The Unlawful Detainer Complaint stated that it was served on Nancy Beck by personal service even though the Unlawful Detainer Complaint was never personally served on either of the Becks or anyone else at their home. On that same day, the Becks contacted Ocwen and spoke with Ocwen representative Abhishek Parpani, who stated that the research regarding the foreclosure sale had been completed and that Ocwen had determined that their home was not in foreclosure.  After the Becks requested to speak with an Ocwen supervisor, Mr. Parpani placed the call on hold.  Thereafter, he returned and informed the Becks that their home had in fact been sold at a trustee's sale to a third-party buyer.  Mr. Parpani also stated, for the first time, that although Ocwen had timely received the Trial Plan Modification agreement, Nancy Beck's signature did not match the signature in Ocwen's records so Ocwen unilaterally decided to invalidate the Trial Plan Modification agreement.  There was absolutely no basis for this decision, as each of the Becks had personally signed the Trial Plan Modification agreement, including Nancy Beck.

57.  The Becks immediately retained counsel, not any of the attorneys of record in this class action case, to represent them in the Unlawful Detainer action. The parties in the Unlawful Detainer action negotiated a settlement; specifically, the Unlawful Detainer action plaintiffs would dismiss the case against the Becks in exchange for the Becks agreeing to move out of their Chino Hills home no later than June 15, 2013.  The Becks moved out of the Chino Hills home on June 15, 2013 and began renting a home in Ontario, California where they currently reside.

///

///

## B.    The Alcaldes

58.    In July of 2013, the Alcaldes submitted a loan modification application to Ocwen in connection with the first mortgage on their owner occupied property. On or about September 20, 2013, Ocwen requested additional documents from the Alcaldes regarding their loan modification.  On or about October 11, 2013, the Alcaldes submitted an updated loan modification application in response to Ocwen's request for additional documents.

59.    On or about January 15, 2014, Nadia Saloon, an Ocwen representative contacted the Alcaldes over the phone.  In this telephone conversation, Ms. Saloon stated that it is Ocwen's business practice to continue to charge late fees for periods when a loan modification application was being considered for one of Ocwen's proprietary loan modifications.  If the borrower is approved for an Ocwen proprietary loan modification, the late fees are capitalized to the back end of the loan modification.  Ms. Saloon further stated that since the Alcaldes were being reviewed for an Ocwen proprietary loan modification, that Ocwen was charging them late fees. Specifically, she stated that Ocwen has been charging the Alcaldes late fees since February of 2013 and Ocwen will continue to charge them late fees for every month going forward.

## VI.   CLASS ACTION ALLEGATIONS

60.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to *Federal Rule of Civil Procedure* 23(a) and (b)(1), (b)(2), and/or (b)(3).  The Classes which Plaintiffs seek to represent are the following Classes:

> 1) The "Approved Application Class," which is comprised of all California homeowners who were approved in writing for a loan modification by OCWEN LOAN SERVICING, LLC who, at any time on or after January 1, 2013, received a Notice of Default, Notice of Trustee Sale, Trustee's Deed Upon Sale, while they were in compliance with the terms of a written trial or permanent loan modification.  The Becks are seeking to be appointed as representatives of this class.

15

2) The "Breached Trial Plan Modification Agreement Class," which is comprised of all California homeowners who received a Trial Plan Modification Agreement from OCWEN LOAN SERVICING, LLC and thereafter OCWEN LOAN SERVICING, LLC completed a foreclosure sale of the premises covered by the Trial Plan Modification Agreement while the homeowner was in compliance with all obligations of the Trial Plan Modification Agreement.  The Becks are seeking to be appointed as representatives of this class.

3) The "Late Fee Class," which is comprised of all California homeowners who, at any time on or after January 1, 2013, paid OCWEN LOAN SERVICING, LLC late fees for periods during which a complete first lien loan modification was under consideration or a denial of the first lien loan modification was being appealed, while the homeowner was making timely modification payments, or while another foreclosure prevention alternative was being evaluated or exercised. The Becks and the Alcaldes are seeking to be appointed as representatives of this class.

61.    Plaintiffs reserve the right to amend or modify the definitions of each of the Classes or to create subclasses limited to particular issues.

62.    Numerosity:  The members of each of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The membership of the each of the Classes is unknown to Plaintiffs at this time; however, based upon the substantial number of loans in California serviced by Ocwen, upon and information and belief, the Classes are each estimated to be in excess of a thousand individuals residing in California, and the identity of such membership is readily ascertainable via inspection of Ocwen's business and loan servicing records.  Class members may be notified of the pendency of this action by electronic mail, the Internet, other mail, or published notice.

63.    Commonality:  There are common questions of law and fact as to each of the Classes which predominate over questions affecting only individual members, including, without limitation to:

    a.  Whether Ocwen violated California's Homeowner Bill Of Rights;

    b.  Whether Ocwen improperly recorded and/or caused to be recorded

Notices of Default, Notices of Trustee Sale, and/or Trustee's Deed Upon Sale;

  c.  Whether Ocwen illegally charged homeowners late fees;

  d.  Whether Ocwen breached trial plan agreements with homeowners;

  e.  Whether Ocwen's conduct was willful or reckless;

  f.  Whether Ocwen was unjustly enriched by their improper course of dealings with homeowners who submitted loan modification applications;

  g.  Whether Ocwen violated California's Unfair Competition Law;

  h.  Whether Ocwen engaged in practices that warrant equitable, injunctive, and monetary relief; and

  i.  The effect upon and the extent of injuries suffered by Plaintiffs and other Class members and the appropriate amount of reimbursement, restitution, damages, or other compensation.

64.  <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the members of each of the Classes that they seek to represent.  Plaintiffs and all members of the Classes sustained injuries and damages arising out of Ocwen's common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Classes were caused directly by Ocwen's wrongful conduct in violation of law as alleged herein.

65.  <u>Adequacy of Representation</u>.  Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs are adequate representatives of the Classes as they have no interests which are adverse to the interests of the absent Class members.  Plaintiffs have retained counsels who have substantial experience and success in the prosecution of complex class action and consumer protection litigation.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

///

66.     A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Classes is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The cost of the court system of adjudication of such individualized litigation would be substantial.  Individualized litigation would also present the potential for inconsistent or contradictory judgments.

67.     In the alternative, the Classes should be certified because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Ocwen;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them, which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Ocwen has acted or refused to act on grounds generally applicable to the Classes, and/or the General Public, thereby making final injunctive relief and/or declaratory relief with respect to the Classes as a whole appropriate.

///

68.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### Violation of California's HBOR – Ban on Dual Tracking
#### (Against All Defendants)

69.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

70.     The HBOR prohibits a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent from recording a notice of trustee sale, or conducting a trustee's sale if the borrower is in compliance with the terms of a written trial or permanent loan modification. Cal. Civ. Code § 2924.11(b).Ocwen violated Cal. Civ. Code § 2924.11(b) both when its REALResolution Foreclosure Module recorded a notice of sale and when Ocwen conducted a trustee's sale of the Becks' home and the homes of similarly situated Approved Application Class members even though the Becks and those Approved Application Class members were in compliance with the terms of Ocwen's Trial Plan Modification Agreements.

71.     Ocwen's violations of Cal. Civ. Code §2924.11(b)as alleged herein were intentional, reckless and/or willful since it purposefully maintains an automated business practice to regularly process completed loan modification applications and to offer delinquent homeowners short-term Trial Plan Modification Agreements, without simultaneously insuring that it was not pursuing foreclosure proceedings while applications were pending and after trial plan modifications had been approved.

///

///

///

///

19

72.   As a direct and proximate result of the aforementioned violations, Plaintiffs and Approved Application Class members have been harmed in the following ways:

- Loss of homes;
- Loss of home equity;
- Relocation costs;
- Loss of Trial Plan Modification Agreement payments and other foreclosure fee payments;
- Loss of the opportunity to pursue other strategies to avoid foreclosure;
- Damage to financial reputations; and
- The financial, credit, and emotional toll of defending against foreclosures.

73.   WHEREFORE, as a result of Ocwen's aforementioned violation of the HBOR's bans on dual tracking, Plaintiffs and Approved Application Class members seek:

a. Damages, including statutory damages, pursuant to Cal. Civil Code §§2924.11(b) and 2924.12(b);

b. Injunctive relief pursuant to Cal. Civil Code §§ 2924.11(b) and 2924.12(a) forbidding Ocwen from continuing to engage in the unlawful acts as alleged herein; and

c. An award of reasonable attorney's fees and costs to the prevailing Plaintiffs per Cal. Civil Code §§ 2924.12(i).

///
///
///
///
///
///

## SECOND CLAIM FOR RELIEF

### Violation of HBOR – Illegal Collection of Late Fees

### (Against All Defendants)

74.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

75.    The HBOR prohibits mortgage servicers from collecting any late fees for periods during which a complete first lien loan modification application is under consideration or a denial is being appealed, the borrower is making timely modification payments, or a foreclosure prevention alternative is being evaluated or exercised. Cal. Civ. Code § 2924.11(f). Ocwen violated Cal. Civ. Code § 2924.11(f) when Defendants' REALResolution platform continued to routinely collect late fees from the Becks and the Alcaldes and other similarly situated homeowners even though the Becks and the Alcaldes and the other Late Fee Class members had completed loan modification applications pending or they were timely making their modified monthly mortgage payments pursuant to Ocwen's Trial Plan Modification Agreements.

76.    In the case of the Becks, Ocwen collected late fees in the amount of $1,790 or more while the Becks were making timely modification payments. Therefore, these late fees were charged in violation of the HBOR.

77.    In the case of the Alcaldes, Ocwen charged late fees in the amount of $769 or more while the Alcaldes' complete first lien loan modification application was under consideration.  Therefore, these late fees were charged in violation of the HBOR.

78.    Ocwen's violations of Cal. Civ. Code § 2924.11(f) as alleged herein were intentional, reckless and/or willful.

79.    As a direct and proximate result of the aforementioned violations, the Becks, the Alcaldes and Late Fee Class members have been harmed by the illegal late fees Ocwen collected during the liability period.

80.   WHEREFORE, as a result of Ocwen's aforementioned violations of the HBOR, the Becks, the Alcaldes and Late Fee Class members seek:

     a.   Damages, including statutory damages pursuant to Cal. Civil Code § 2924.12(b);

     b.   Injunctive relief pursuant to Cal. Civil Code § 2924.12(a) forbidding Ocwen from continuing to engage  in the unlawful acts as alleged herein; and

     c.   An award of reasonable attorney's fees and costs to the prevailing Plaintiffs per Cal. Civil Code §§ 2924.12(i).

## THIRD CLAIM FOR RELIEF

### Breach of Contract

(Against All Defendants)

81.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

82.   The Becks and Breached Trial Plan Modification Agreement Class members entered into written Trial Plan Modification Agreements with Ocwen, which are valid, enforceable contracts.  Ocwen routinely made loan modification offers through formal written Trial Plan Modification Agreements, an example of which is attached hereto as Exhibit A.  The terms of Ocwen's standardized Trial Plan Modification Agreement provides:

> In order for the terms of this modification to become effective, you promise to make an initial payment of . . . on or before . . . and one (1) equal monthly payment of principal and interest in the amount of . . . to Ocwen ("Trial Period") beginning on . . . You agree that, at the end of the Trial Period, the new principal balance due under your modified Note and the Mortgage will be . . .

83.   The standardized Ocwen Trial Plan Modification Agreement  further states that:

> If you successfully complete the Trial Period, your loan will automatically be modified pursuant to the terms of this Agreement (the "Modification").

22